IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FRANCES FRANCO,

    **Plaintiff,**

vs.                                                  No. CIV 01-0071 WJ/WWD-ACE

LEPRINO FOODS COMPANY,

    **Defendant.**

**DEFENDANT'S PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW**

Defendant submits the following Proposed Findings of Fact and Conclusions of Law, and respectfully requests the opportunity to amend these to conform with the evidence presented at trial.

**I. FINDINGS OF FACT**

1. Plaintiff completed and signed a Leprino employment application on or about July 29, 1999. The front page of the application states, in part:

> I understand that my employment is not governed by any written or oral contract and is considered an "at-will" arrangement. I also understand that my employment is not for any definite period or succession of periods. This means that I am free, as is the company, to terminate the employment relationship at any time for any reason, so long as there is no violation of applicable federal or state law. No one other than the Chairman of the Board has the authority to form an employment agreement or contract of any type.

2. Plaintiff was hired by Leprino on August 12, 1999, as a sweeper at Leprino's cheese processing plant in Roswell, New Mexico. The area of the manufacturing plant where Plaintiff

worked was a busy, open area, visible to others from some distance.  The Leprino plant operates 24 hours per day, seven days per week, 365 days per year.

   3. At the commencement of her employment at Leprino, Plaintiff was given a copy of Leprino's written Employee Handbook.  Plaintiff acknowledged that she read the handbook.

   4. The Employee Handbook contains an "Acknowledgment of Understanding" which was executed by Plaintiff at the inception of her employment.  The Acknowledgment of Understanding provides, in part:

> I have received a copy of the Leprino Foods Company Employee Handbook.  I understand that it is my responsibility to become familiar with the contents of this booklet as it outlines my benefits and the Company's policies.

   5. Sean Benson was one of many supervisors in the Processing Department at the Roswell facility.  Other supervisors included Sean Garret, Darlene Parsons, and Henry Nunez.  Mr. Benson, along with the other supervisors, supervised Plaintiff and Alex Loeza.

   6. Alex Loeza was a foreperson in the Processing Department.  As a foreperson, Mr. Loeza understood the different tasks that needed to be performed in the Processing Department and was responsible for monitoring the manufacturing process and to ensure that the process flowed smoothly and correctly.  As a foreperson, Mr. Loeza had minimal authority over other employees.  He had no authority to hire, fire, demote, transfer, determine pay, or discipline.  He also did not prepare performance appraisals or had any input into such appraisals.  Those functions were performed by only supervisors or management level employees.  Forepersons and all other processing department employees answered to supervisors and performed work at the direction of

supervisors. Mr. Loeza was not a "supervisor" as that term is used or interpreted in court decisions involving claims under Title VII of the Civil Rights Act of 1964, as amended.

7. Gilbert Blancas was the Human Resources ("HR") Manager for Leprino's Roswell facility. As HR Manager, Mr. Blancas was responsible for investigating a variety of employment matters, including reports of sexual harassment. He had significant experience as an HR manager as a result of several years of previous employment in private industry, and that experience included conducting investigations of harassment claims and disciplinary matters.

8. Steven Becker was the Plant Manager for Leprino's Roswell Facility. He has significant management experience in private industry. Mr. Becker made the decision to terminate Plaintiff's employment.

9. When she was hired, Plaintiff agreed to comply with Leprino's Standards of Employee Conduct.

10. The Standards of Employee Conduct provide: "The following employee conduct will be considered unacceptable behavior and shall be cause for dismissal... Disorderly or immoral conduct... Assault and fighting while on the job. Insubordination ... Use of threats, intimidation, or coercion toward fellow employees, supervisors, customers or visitors ..."

11. On May 25, 2000, while Plaintiff was at work, she became involved in an argument with her foreperson, Mr. Loeza. Supervisor Benson intervened and sent both Plaintiff and Mr. Loeza home.

12. HR Manager Blancas promptly investigated the May 25th incident. Mr. Blancas interviewed Plaintiff, Mr. Loeza and Mr. Benson. In his interview of Mr. Benson, Mr. Blancas learned that Plaintiff was "clearly the aggressor" in the argument. Mr. Blancas obtained a statement

from two co-workers, Irma Chairez and Lucy Ibarra, who witnessed the argument and who stated that Plaintiff pushed Mr. Loeza during the argument. Mr. Blancas also obtained a statement from Mr. Benson which indicated that a third co-worker, Christie Vallejos, also witnessed Plaintiff pushing Mr. Loeza during the argument. Mr. Blancas reported the results of his investigation to Mr. Becker.

13. Based on the report of the investigation by Mr. Blancas, Mr. Becker reasonably believed and concluded that Plaintiff had used abusive and threatening language towards her foreperson, Mr. Loeza, and that Plaintiff had physically pushed Mr. Loeza. Mr. Becker based his decision to terminate Plaintiff on his reasonable belief that she was fighting at work, which included her using abusive and threatening language.

14. Plaintiff, who was an at-will employee who could be terminated at any time for any reason or no reason at all, was terminated on May 30, 2000, as a result of the incident with Mr. Loeza.

15. After her termination, Plaintiff sent two separate letters to Mr. Becker, one dated May 31, 2000, and one dated June 1, 2000. Significantly, the letters stated that "I enjoy[ed] my job with Leprino" and that she agreed that there was a "personal conflict" with Mr. Loeza. The letters suggested that Plaintiff admitted to engaging in the conduct resulting in her termination, but that she believed the discipline of termination was "to severe." Importantly, neither of those letters mentioned, or even suggested, that Plaintiff claimed she was being sexually harassed.

16. According to Plaintiff, at some time in March, April or May of 2000, she went to Sean Benson, her supervisor, to discuss "problems" she was having with Mr. Loeza. Mr. Benson prepared a memorandum regarding the meeting, which in fact occurred on February 25, 2000.

4

Nowhere in the memo is there any reference to her complaining about any conduct on the part of Mr. Loeza that could be considered sexual harassment. Mr. Benson testified that Plaintiff did not complain of any conduct on the part of Mr. Loeza that could be considered sexual harassment; rather she complained merely that he was "picking on her" and making her work harder than others.

17. After the February meeting, Plaintiff never mentioned any problems whatsoever with Mr. Loeza until she was sent home from work after the incident with Mr. Loeza on the evening of May 25, 2000. As she was being escorted out of the plant, she told Mr. Benson for the first time that she was being sexually harassed by Mr. Loeza. Mr. Benson promptly communicated that information to Mr. Blancas, the HR Manager.

18. Mr. Blancas promptly interviewed Plaintiff about the incident with Mr. Loeza and about her claim of sexual harassment. Plaintiff told Mr. Blancas that she did not like Mr. Loeza getting close to her and that he "bumped into her on several occasions." When asked where it happened, when it happened and how exactly it happened, Plaintiff could not and would not provide any detail. She also directed Mr. Blancas not to take any further action on her claim because Mr. Loeza was "a family man." Prior to May 25, 2000, Mr. Blancas had not received a report, directly or indirectly, orally or in writing, that Plaintiff felt she was being sexually harassed.

19. Plaintiff contends that Mr. Loeza was the only employee that allegedly harassed her.

20. Nearly six months after her termination, on or about August 9, 2000, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging the following forms of discrimination: sex and age. The charge did not include any claim under the separate category of retaliation.

21. Leprino investigated and subsequently responded to Plaintiff's EEOC charge. Leprino's investigation determined that Plaintiff was not discriminated against on the basis of sex, age or otherwise, and that she was not sexually harassed.

22. During her employment at Leprino, Plaintiff never reported any of the allegations raised in her EEOC filing or this lawsuit to the HR Manager or anybody else who would have been in a position to investigate or take any corrective or remedial action on her behalf if such action were warranted.

23. Leprino takes aggressive measures to discourage discrimination (including sexual harassment) in the work place. Reported incidents involving alleged discrimination or harassment are immediately investigated and, if verified, appropriate disciplinary action is taken. The disciplinary action may include termination.

24. Leprino has, and had at the time of Plaintiff's employment, a written sexual harassment policy which states in part:

**Sexual Harassment**

> It is against Leprino Foods Company policy for any person to use their official authority in making sexual advances toward employees over whom the person is authorized to make or recommend personnel actions; to grant, recommend, or refuse to take personnel action because of sexual favors; and to take or fail to take a personnel action as reprisal against any employee for rejecting or reporting a sexual advance. It is also against company policy for a manager or supervisor to allow any employee to be sexually harassed, either verbally or physically, by a co-worker. The Company will take disciplinary action, up to and including termination, against any employee, whether supervisor or co-worker, who has violated this policy.

25. Leprino's Sexual Harassment policy specifies that employees may register their complaints to their immediate supervisor, or their HR representative.

26. Leprino's Sexual Harassment policy is available to any employee through Leprino's computerized policy and procedure system. Training is held for all supervisors and managers on EEO and sexual harassment policies. All employees receive training on the sexual harassment policy when hired and at certain intervals during their employment.

27. Leprino has, and had at the time of Plaintiff's employment, a written equal employment opportunity policy.

28. Any employee who discriminates against other employees on the basis of race, sex (including sexual harassment), religion, color, national origin or age or who creates a hostile work environment is not acting in the course and scope of his or her employment and is not otherwise authorized to engage in such behavior.

29. From time to time, Leprino's employees were (and are) made aware of to whom they could report concerns or problems with respect to Leprino's EEO and related policies. For example, on March 31, 1997, Leprino's President, Wes Allen, sent a memorandum to all employees regarding Leprino's sexual harassment policy which stated, in part, "[i]f you have a concern or questions regarding this policy, please let either your manager or Human Resources person know." A subsequent memorandum with similar information was sent to all employees on September 23, 1999 by Steve Becker, the Plant Manager.

30. Plaintiff was aware of these notice procedures and the people to whom she could report any concerns regarding discrimination of all types.

31.     Eight months after the termination of her employment, Plaintiff applied for and obtained a job at Impact Confections; she stated that she had left her employment at Leprino because of "sickness in the family." Despite this falsification, she was hired on January 25, 2001 and was earning $6.25 per hour until she failed to report to work and was terminated on February 3, 2001.[1] Thereafter, she was hired by Wal-Mart where she earned $6.53 per hour. Her employment at Wal-Mart ended after she was warned for poor performance.

32.     Plaintiff first sought professional help for alleged emotional distress in April 2001, almost one year after her termination from Leprino. However, her sole complaint at that time was that the cause of her distress was her husband's chronic illness. She said nothing to her mental health care provider about the loss of her job at Leprino, or any harassment.

33.     In late 2001, at the request of her attorney, Plaintiff was evaluated by Sandra Montoya, Ph.D., a clinical psychologist who conducted psychological testing that established Plaintiff was exaggerating her symptoms, that she has a long-standing underlying personality disorder which pre-existed her employment at Leprino, and that she is not disabled from working.

## II. CONCLUSIONS OF LAW

1.     This Court has jurisdiction over the parties and the subject matter.

---

[1] Plaintiff also misrepresented her credentials when she applied for employment at Leprino. For example, Plaintiff represented that she had graduated from Portales High School when, in fact, she had not. Additionally, she represented that she had left her former job as the result of a "foreclosure on property." Contrary to such statement, Plaintiff had been terminated by her previous employer.

2. The decision by the Defendant to terminate Plaintiff's employment was for legitimate business reasons. The decision was not a pretext for illegal discrimination or retaliation on the part of the Defendant.

3. Based upon the above findings of fact, Alex Loeza, was not a supervisor as that term is used or interpreted in court decisions involving claims under Title VII of the Civil Rights Act of 1964, as amended.

4. The Plaintiff has failed to prove unlawful harassment prohibited by Title VII of the Civil Rights Act of 1964, as amended, or unlawful retaliation. The Plaintiff has failed to present evidence sufficient to support her claims against the Defendant.

5. Judgment should be entered in this action in favor of the Defendant.

6. The Court reserves jurisdiction to consider the award of costs and attorneys fees incurred by the Defendant.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.


By_____
   Theresa W. Parrish
Post Office Box 1888
Albuquerque, NM 87103
(505) 765-5900

    and

CAMPBELL BOHN KILLIN BRITTAN & RAY, LLC
Michael G. Bohn
270 St. Paul Street, #200
Denver, CO 80206
(303) 322-3400

Attorneys for Defendant

We hereby certify that a copy of the foregoing pleading was mailed to opposing counsel of record this 30th day of December, 2002.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By_____
    Theresa W. Parrish